JUDGE KAPLAN

GORENSTEIN

05 CV 0856

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===========================X

JOSE LARES, M.D.,

    Plaintiff,

      -against-

**WESTCHESTER MEDICAL CENTER,**
**WESTCHESTER COUNTY HEALTH CARE**
**CORPORATION and KATHRYN**
**McGOLDRICK, M.D., ,**

    Defendants.
===========================X

**COMPLAINT**

Docket No.:

**PLAINTIFF DEMANDS A**
**TRIAL BY JURY**

RECEIVED JAN 25 2005 S.D.C. S.D.N.Y. CASHIERS

Plaintiff **JOSE LARES, M.D.**, by his attorneys **BENEDICT P. MORELLI &**

**ASSOCIATES, P.C.**, complaining of the Defendants herein, upon information and belief

respectfully alleges as follows:

### BACKGROUND

1.    Plaintiff **JOSE LARES, M.D.** ("**DR. LARES**") is a resident of the County of

Queens, City and State of New York.

2.    At all times hereinafter mentioned, Defendant **WESTCHESTER COUNTY**

**HEALTH CARE CORPORATION** ("**WCHCC**") was a public benefit corporation duly

authorized and existing under and by virtue of the Laws of the State of New York, with its

principal place of business in the City of White Plains, County of Westchester, State of New

York.

3.    At all times hereinafter mentioned, Defendant **WESTCHESTER MEDICAL**

**CENTER**, a hospital, was a corporation duly organized and existing under and by virtue of the

Laws of the State of Delaware, with its principal place of business in the City of White Plains, County of Westchester, State of New York.

4.      At all times mentioned herein, Defendant **WCHCC** and its agents, servants and/or employees, owned, operated, controlled and managed Defendant **WESTCHESTER MEDICAL CENTER**, and its agents, servants and/or employees.

5.      At all times mentioned herein, pursuant to the laws of the State of New York, Defendant **WCHCC** provided personnel to Defendant **WESTCHESTER MEDICAL CENTER**, including doctors, residents, interns, nurses, attendants and others for the care and treatment of its patients to whom the facility was made available.

6.      At all times mentioned herein, Defendant **KATHRYN McGOLDRICK, M.D.,** (**"DR. McGOLDRICK"**) was an employee of Defendant **WCHCC** and was authorized to treat patients at **WESTCHESTER MEDICAL CENTER** by Defendant **WCHCC**.

7.      At all times mentioned herein, Defendant **DR. McGOLDRICK** was Chairman of the Anesthesiology Department at Defendant **WESTCHESTER MEDICAL CENTER**.

8.      At all times mentioned herein, Moses Bairamian, M.D., was an employee of Defendant **WCHCC** and was authorized to treat patients at **WESTCHESTER MEDICAL CENTER** by Defendant **WCHCC**.

9.      At all times relevant hereto, Moses Bairamian, M.D. was Program Coordinator and an Attending Anesthesiologist in the Anesthesiology Department at Defendant **WESTCHESTER MEDICAL CENTER**.

10.     At all times mentioned herein, Ramona Stanculescu, M.D. was an employee of Defendant **WCHCC** and was authorized to treat patients at **WESTCHESTER MEDICAL CENTER** by Defendant **WCHCC**.

11.     At all times relevant hereto, Dr. Ramona Stanculescu was Chief Resident Anesthesiologist in the Anesthesiology Department at Defendant **WESTCHESTER MEDICAL CENTER**.

12.     Commencing on or about July 1, 2001 until his constructive termination on or about September 2003, Plaintiff **DR. LARES** was employed by Defendant **WCHCC** as a resident physician in the Anesthesiology Department at Defendant **WESTCHESTER MEDICAL CENTER**.

13.     Commencing on or about July 1, 2001 until  his constructive termination on or about September 2003, Defendant **DR. McGOLDRICK** was Plaintiff **DR. LARES'** direct supervisor at Defendant **WESTCHESTER MEDICAL CENTER**, and an officer, manager and/or employee of Defendant **WCHCC**.

14.     At all times material to this Complaint, the officers, directors, supervisors, managers, employees and/or agents of **WCHCC** acted within the scope of their duties as officers, directors, supervisors, managers, employees and/or agents of Defendant **WCHCC.**

15.     Jurisdiction of the subject matter of this action is established in this court under The Americans' With Disabilities Act of 1990 ("ADA"), 42 U.S.C. Section 12101 et seq. This is the proper venue for this action under 42 U.S.C. Section 12101 et seq., in that unlawful acts alleged herein were committed within this court's jurisdiction.

16.     On or about June 1, 2004, Plaintiff **DR. LARES** filed a discrimination claim with the New York State Division of Human Rights and the EEOC.  On or about November 5, 2004, the EEOC issued a Notice of Right to Sue on Plaintiff's behalf.

## GENERAL ALLEGATIONS

17.     During the period commencing on or about June 1, 1999 to on or about June 30, 2001, Plaintiff **DR. LARES** was employed by Our Lady of Mercy Hospital as a resident physician in its Anesthesiology Department.  During that time, Plaintiff **DR. LARES** successfully completed rotations in Clinical Anesthesia and Surgical Internship.  Both Our Lady of Mercy Hospital and Defendant **WESTCHESTER MEDICAL CENTER** are affiliated with New York Medical College.

18.     Commencing on or about July 1, 2001, Plaintiff **DR. LARES** started his employment at Defendant **WESTCHESTER MEDICAL CENTER**.  Plaintiff needed two more years to complete his four-year residency requirement.  Plaintiff's assignment to Defendant **WESTCHESTER MEDICAL CENTER** was considered a promotion, since the hospital offered a better salary, a housing option and other benefits.

19.     Plaintiff **DR. LARES** is an openly gay man whose long-time companion/domestic partner, John, is HIV-Positive.  John has been suffering from AIDS since approximately 1992.

20.     During the course of his employment, Plaintiff **DR. LARES** was the only openly homosexual physician in Defendant **WESTCHESTER MEDICAL CENTER**'s Anesthesiology Department, and was commonly perceived to be HIV-Positive.  Indeed, at the commencement of Plaintiff's residency, Plaintiff **DR. LARES** was warned by Resident Dr. Mario Fernandez, a closeted homosexual, to conceal his sexual orientation due to rampant homophobia at **WESTCHESTER MEDICAL CENTER**.

21.     During the course of his employment, as a consequence of his sexual orientation and Defendants' suspicion and perception that Plaintiff had a disability (namely, that he was HIV-Positive), Plaintiff **DR. LARES** was subjected to an ongoing and oppressive hostile work

environment, including subjection to discriminatory treatment, harassment, ridicule, physical

violence, and contempt.  Indeed, this hostile work environment was so offensive and egregious

that it severely altered the terms and conditions of Plaintiff's employment.

22.    Plaintiff **DR. LARES'** complaints concerning the discrimination and hostile work

environment he was subjected to because of his perceived disability and sexual orientation were

ignored.   In fact, as a consequence of Plaintiff's complaints, he was retaliated against in a series of

inappropriate and unfair acts culminating in his unlawful termination.

23.    Moreover, from the time Plaintiff **DR. LARES** disclosed that his significant other

was HIV-Positive through his unlawful termination, Plaintiff was subjected to a series of

discriminatory and retaliatory events designed to force his departure from **WCHCC**.

<u>SPECIFIC ALLEGATIONS</u>

24.    Throughout **DR. LARES'** employment at Defendant **WESTCHESTER**

**MEDICAL CENTER** from approximately July 1, 2001 through approximately July 2003, there

were approximately 30 Attending Anesthesiologists and approximately 20 Anesthesia Residents

in Defendant's Anesthesiology Department.  During that time, Plaintiff **DR. LARES** was the

only openly gay physician employed in the hospital's Anaesthesiology Department.

25.    Commencing approximately July 2001 through approximately Summer 2002,

approximately weekly, Plaintiff **DR. LARES** repeatedly discovered that his clothes had been

removed from the men's changing room and placed in the women's changing room at Defendant

**WESTCHESTER MEDICAL CENTER**.

26.    Commencing approximately July 2001 through approximately Summer 2002,

approximately weekly, two heterosexual male Anesthesia Residents (Dr. Medina and Dr. Caruso)

repeatedly referred to Plaintiff **DR. LARES** as "faggot" or "maricon," (a Spanish epithet referring

to homosexual men.)

27.    Commencing approximately July 2001 through approximately Summer 2002, approximately weekly, two heterosexual male Anesthesia Residents, Dr. Medina, Dr. Fioretti and Dr. Caruso repeatedly whistled at, leered toward and/or giggled lasciviously around Plaintiff **DR. LARES**.  A third heterosexual male Anesthesia Resident, Dr. Fioretti, also participated in this conduct from approximately July 2001 until his graduation in approximately December 2001.

28.    Commencing approximately July 2001 through approximately May 2003, approximately weekly, three heterosexual male Anesthesia Residents, Dr. Medina, Dr. Caruso, and Dr. Mohammad Choutrhy, refused to work with Plaintiff **DR. LARES**, apparently because of Plaintiff's homosexuality and perceived disability.  (Dr. Medina graduated in approximately August 2002.)

29.    In approximately August 2001, shortly after the appointment of Defendant **DR. McGOLDRICK** as Director of Defendant **WESTCHESTER MEDICAL CENTER**'s Anesthesia Department, Plaintiff **DR. LARES** met with Defendant **DR. McGOLDRICK**, informed her that he was gay, and complained to her that since his arrival at **WESTCHESTER MEDICAL CENTER** he had been the victim of constant verbal harassment (including homophobic epithets such as "faggot"), and constant written harassment (including lewd graffiti written about him), because of his sexual orientation.  While Defendant **DR. McGOLDRICK** promised to redress the situation, nothing was done.

30.    Commencing approximately September or October 2001 through approximately January 26, 2003, approximately once every two weeks, Plaintiff **DR. LARES** discovered lewd, homophobic graffiti drawn in pen or carved above his bunk bed in the resident's "on-call room."  This graffiti included drawings of penises and perverse and degrading messages such as: "Jose's

eating cock."

31.    In approximately Fall 2001, Defendant **WESTCHESTER MEDICAL CENTER**'s employee, Attending Anesthesiologist and Program Coordinator Dr. Moses Bairamian, ostensibly a heterosexual, made sexual advances toward Plaintiff **DR. LARES**.  Dr. Bairamian's sexual advances included his making numerous telephone calls to Plaintiff **DR. LARES** at his home, constantly seeking Plaintiff's whereabouts, showing up at Plaintiff's residence on campus, and culminated in Dr. Bairamian's making sexual overtures toward Plaintiff **DR. LARES**  in the men's bathroom.  Plaintiff **DR. LARES** rejected those advances.

32.    In direct retaliation for Plaintiff's rejection of his sexual advances, Dr. Moses Bairamian subsequently assigned Plaintiff **DR. LARES** a significantly heavier work schedule.

33.    On or about December 2001, Plaintiff **DR. LARES** complained to Defendant **DR. McGOLDRICK** that he had received a heavier schedule than the other residents (for instance, approximately 10 as opposed to seven 24-hour calls) for the ensuing rotation from approximately December 2001 to approximately March 2002.  Plaintiff **DR. LARES** continued to receive heavier assignments during the rotation from approximately July 2002 to approximately December 2002, and again from approximately March 2003 to approximately June 2003.  This heavier workload was in direct retaliation for his complaint of sexual orientation discrimination and harassment.  The schedule was assigned by Program Coordinator Dr. Moses Bairamianan and by Chief Resident Dr. Ramona Stanculescu, and subject to Defendant **DR. McGOLDRICK**'s approval.  Nothing was done.

34.    Commencing approximately December 2001 through the remainder of his residency through approximately June 2003, Plaintiff **DR. LARES** repeatedly complained to Attending Anesthesiologist Valerie Walker and to his assigned mentor, Dr. Rosco Katende,

concerning the discrimination he was subjected to at Defendant **WESTCHESTER MEDICAL CENTER** because of his sexual orientation and because of the commonly held perception there that he was HIV-Positive.  Although Dr. Walker and Dr. Katende appeared sympathetic, nothing changed.

35.     On or about March 2002, Plaintiff **DR. LARES** informed his supervisors, Dr. Kubal, Dr. Bairamian and Defendant **DR. McGOLDRICK**, that his significant other, John, was gravely ill.  When Defendant **DR. McGOLDRICK** inquired concerning the nature of John's illness, Plaintiff asked if their discussion was confidential.  After Defendant **DR. McGOLDRICK** assured Plaintiff that she would not disclose his confidences, Plaintiff **DR. LARES** revealed that his partner was HIV-Positive and had AIDS.

36.     When Defendant **KATHRYN McGOLDRICK** directly asked Plaintiff **DR. LARES** if he was HIV-Positive, **DR. LARES** said he was not.  However, from that time forward, Plaintiff was treated with increasing hostility by the staff and administration at Defendant **WESTCHESTER MEDICAL CENTER**.

37.     Upon disclosing his significant other's HIV status in March 2002, Plaintiff **DR. LARES** requested Defendant **DR. McGOLDRICK**'s permission to start his rotation 30 minutes later every morning in order to first administer John's medications.  In so doing, Plaintiff **DR. LARES** promised that he would make up the half hour at the end of each day.  Defendant **DR. McGOLDRICK** denied Plaintiff's request.

38.     Instead, upon learning in approximately March 2002 that Plaintiff **DR. LARES'** significant other was HIV-Positive, Defendant **DR. McGOLDRICK** suggested that Plaintiff place his partner in a nursing home.  When Plaintiff **DR. LARES** asked Defendant **KATHRYN McGOLDRICK** if she would place her husband in a nursing home under such circumstances,

Defendant responded: "It's not the same." Defendant **DR. McGOLDRICK** then rather bizarrely expressed her regret that people in her program did not take their career seriously and had priorities other than medicine, such as parties and fashion.

39.     Upon disclosing his significant other's HIV status in March 2002, Plaintiff **DR. LARES** asked Defendant **DR. McGOLDRICK** to desist from assigning him cases in the isolation ward in light of John's compromised immune system. Instead, within the month, Defendant **DR. McGOLDRICK** assigned Plaintiff **DR. LARES** to the ICUD, where most of the patients in isolation were situated.

40.     In approximately March 2002, shortly after disclosing his significant other's HIV status to his supervisors, including Defendant **DR. McGOLDRICK**, Resident Anesthesiologist Dr. Chouthry told Plaintiff: "I'm sorry, but I refuse to work with you." His refusal to work with Plaintiff was apparently due to Plaintiff's sexual orientation and the commonly held perception that Plaintiff was HIV-Positive.

41.     Following Plaintiff's disclosure of his boyfriend's HIV-Positive status, from approximately March 2002 until his wrongful termination, Defendants required Plaintiff **DR. LARES** to apply double-tape on his fingers when he dealt with blood and blood products, and to wear two pairs of surgical gloves when he worked on patients. In addition, at Defendant **WESTCHESTER MEDICAL CENTER**'s insistence, Plaintiff **DR. LARES** repeatedly underwent HIV testing.

42.     In approximately March 2002, Plaintiff **DR. LARES** noted serious departures from good and accepted medical practice at Defendant **WESTCHESTER MEDICAL CENTER**, consisting of medical malpractice and falsification of medical records, creating a substantial and specific danger to the public health and safety of its patients.

43.    On or about March 2002, a Resident Physician at Defendant **WESTCHESTER**

**MEDICAL CENTER,** working without the supervision of an Attending Physician, administered

four times the required dosage of opiates to an ill patient. When the Resident discovered his

error, he then administered the antidote, but this time at 100 times the prescribed dosage.

44.    As a consequence, the patient suffered severe neurological impairment and was

transferred to the ICU Ward on mechanical ventilation. On information and belief, the patient

died on or about March 9, 2002. However, when Plaintiff **DR. LARES** subsequently looked for

the patient's chart during the regular course of his duties, Plaintiff was informed there was no

clearance for the chart's removal because it was a "hot chart."

45.    On or about late March 2002, Plaintiff **DR. LARES** reported the entire

circumstances to his supervisor, Defendant **DR. McGOLDRICK,** including the serious

deficiencies in the emergency equipment. Chillingly, Defendant **DR. McGOLDRICK**

responded: "Every time you point your finger at someone, four fingers will be pointed at you."

Defendant **DR. McGOLDRICK** subsequently forbade Plaintiff **DR. LARES** from presenting the

patient's case history at the Morbidity Mortality Conference. Plaintiff subsequently discovered

that Dr. Bairamian had instructed the nurses in PACU (the recovery room) to write up any

incident, however minor, involving Plaintiff.

46.    On or about April 29, 2002, despite all evidence to the contrary, Plaintiff **DR.**

**LARES** received notice from Defendant **DR. McGOLDRICK** expressing "deep concern about

[Plaintiff's] apparent inability to deal well consistently with stress."

47.    In approximately late Spring or early Summer 2002, a sewage pipe burst above

Plaintiff **DR. LARES'** bunk and splashed its contents over him. Plaintiff **DR. LARES** asked the

Attending Anesthetist, a heterosexual man, to cover his rounds for him so Plaintiff could shower

and retrieve clean clothes.  Plaintiff's request was denied.

48.    On or about July 2002, Plaintiff **DR. LARES** discovered homophobic graffiti on the windshield of his car, which was parked in the Residents' parking lot.  The lipsticked message read: "How much would you charge for a B.J. (*blow job*) and an H.J. (*hand job*)."  The windshield also bore the epithet: "Faggotmobile."  The exterior paint along the driver's side of Plaintiff's car was also deeply scratched.

49.    On or about July 2002, Plaintiff **DR. LARES** reported this incident to Security and to Defendant **DR. McGOLDRICK**  Nothing was done.

50.    In approximately August 2002, Plaintiff **DR. LARES** once again discovered homophobic graffiti on his car in the Residents' parking area.  The homophobic epithet "sissy" was lipsticked on the windshield of Plaintiff's car, and a handwritten note was tucked under the windshield wiper.  The note was threatening, and bore a cryptic message to the effect: "I'll meet you outside the hospital.  Let's see who will defend you."  Plaintiff **DR. LARES** again reported this incident to Security and to Defendant **DR. McGOLDRICK**, and handed Defendant the note.  However, nothing was done.

51.    In approximately August 2002, Dr. Caruso, a male heterosexual Resident, asked Plaintiff **DR. LARES** to cover the Pain Service for him.  At the time, **DR. LARES** was already holding the beeper for (and covering the Anesthetist positions for) the ICU and Trauma wards as well as the "Code" beeper.  Plaintiff **DR. LARES** explained the circumstances to Dr. Caruso and declined.  Resident Anesthetist Dr. Caruso thereupon physically assaulted Plaintiff **DR. LARES** in the Anesthesia Department hallway.  Dr. Caruso violently slammed Plaintiff **DR. LARES** against the wall, jabbed his finger into Plaintiff's forehead, and exclaimed: "Listen to me, you miserable faggot, you take the beeper or I'm going to punch you!"  Dr. Caruso had to be

physically restrained by two attendants, including Dr. Kabul.

52.     In approximately August 2002, Plaintiff **DR. LARES** complained again to Defendant **DR. McGOLDRICK** concerning sexual orientation discrimination.  **DR. LARES** informed Defendant **DR. McGOLDRICK** that the ongoing verbal and sexual harassment he had complained of a year earlier had continued unabated at Defendant **WESTCHESTER MEDICAL CENTER**.  Plaintiff **DR. LARES** further informed Defendant that Dr. Caruso had gay bashed him at the hospital.

53.     In response to Plaintiff **DR. LARES'** complaint, Defendant **DR. McGOLDRICK** asked Dr. Caruso to apologize, instructed Plaintiff to accept the apology, and told Plaintiff: "boys will be boys."  In so doing, Defendant **DR. McGOLDRICK** further noted that "not everyone is as understanding about homosexuality as I am."  Indeed, Dr. Caruso was neither suspended nor disciplined in any manner.

54.     In approximately 2003, Defendant **DR. McGOLDRICK** extended Dr. Caruso's employment after Dr. Caruso took administrative leave during his wife's illness, enabling Dr. Caruso to complete his residency program after the expiration of his original employment contract.  Defendant **DR. McGOLDRICK** subsequently denied Plaintiff **DR. LARES** the same courtesy.

55.     On or about October 7, 2002, Plaintiff **DR. LARES** was assigned to treat a patient, a 40-year-old ConEd employee, who had been admitted to Defendant **WESTCHESTER MEDICAL CENTER**'s critical/burn unit approximately two weeks earlier after sustaining third degree electrical burn injuries.

56.     On or about October 7, 2002, a nurse knocked the patient's endotracheal tube loose while caring for the patient.  The patient immediately had difficulty breathing.  Without

informing Plaintiff **DR. LARES** or any other physician, the nurse then tried to reinsert the

endotracheal tube himself.  Because the tube was then improperly inserted, the patient's lung was

overinflated.  The nurse then improperly extracted the tube, so that the tube blocked incoming

air.  Although the nurse summoned the Code 99 Team, the Team failed to arrive.  When

Plaintiff **DR. LARES** arrived, the only people in the room were the Surgical Resident, the

Surgical Attending and the Nurse.  At the time, no Attending Anesthesiologist was covering the

patient.  Plaintiff then discovered that the ward's laryngoscope did not contain any batteries.  On

many past occasions, Plaintiff **DR. LARES** had complained to Defendant **DR. McGOLDRICK**

that the hospital severely lacked adequate emergency equipment.  Plaintiff had to direct and

perform CPR on the patient.  Tragically, as a consequence of the hospital's gross negligence, the

patient died.

57.    As part of his responsibilities as an Anesthesiology Resident, Plaintiff **DR.**

**LARES** was assigned to report to Defendant **WESTCHESTER MEDICAL CENTER's**

Morbidity Mortality Conference concerning the deceased patient.

58.    Following the patient's death on or about October 7, 2002, Plaintiff **DR. LARES**

reviewed the patient's chart and discovered that the chart curiously failed to reflect what the

foregoing circumstances.  On or about October 27, 2002, Plaintiff **DR. LARES** attempted to

explain the circumstances underlying the patient's death at the Morbidity Mortality Conference.

However, Defendant **DR. McGOLDRICK** abruptly ordered Plaintiff **DR. LARES** to stop

talking.

59.    Commencing with the start of his employment on or about July 1, 2001 until he

disclosed his partner's HIV-Positive status on or about March 2002, Plaintiff **DR. LARES**

regularly received positive evaluations from his supervisors at Defendant **WESTCHESTER**

**MEDICAL CENTER**, as well as high praise from the patients he served while working at the hospital.

60.     Throughout his residency, commencing approximately June 1, 1999 until his final "incomplete" semester in Spring 2003, Defendant **WCHCC** reported to the American Society of Anesthesiologists( ABA American Board of Anesthesiologist) Plaintiff **DR. LARES'** "satisfactory" completion of each semester of his residency.

61.     In approximately October 2001, Defendant **DR. McGOLDRICK** wrote a glowing report concerning Plaintiff **DR. LARES'** job performance.

62.     On or about September 30, 2002, within weeks of his August 2002 complaint of sexual orientation discrimination to Defendant **DR. McGOLDRICK**, Plaintiff received his first "unsatisfactory" performance evaluation.  Prior to complaining of sexual orientation discrimination and harassment, and prior to disclosing his significant other's HIV+ status, Plaintiff **DR. LARES** never received a negative performance evaluation.

63.     In approximately Fall 2002, following the disclosure of his sexual orientation and his partner's HIV-Positive status, Plaintiff **DR. LARES** was denied every elective rotation he requested.  Plaintiff was the only Anesthesia Resident denied all his elective rotations.  In fact, Plaintiff never received a full Pediatric or Cardiothoracic rotation, considered core curriculum for Anesthesia Residents.  Instead, Plaintiff **DR. LARES** was assigned those rotations commonly considered the most exhausting, i.e. "ACT" involving critical patients, and six months of "neuroanesthesia."

64.     In approximately October 2002, Plaintiff **DR. LARES** complained to Defendant **DR. McGOLDRICK** that Defendants' refusal to assign him any of the electives he chose, and his recent negative performance evaluation, appeared to be in direct retaliation for his continued

complaints of sexual orientation discrimination and harassment, and recent disclosure of his partner's HIV-Positive status.

65. In response to his complaint, Defendant **DR. McGOLDRICK** became visibly angry, reminded Plaintiff **DR. LARES** of her purportedly unblemished career, and accused Plaintiff of insubordination. Unfortunately, Defendant **DR. McGOLDRICK** once again failed to redress Plaintiff's concerns.

66. Plaintiff was subsequently subjected to mounting harassment and retaliation by Defendants. Commencing approximately November 2002 until approximately January 9, 2003, and again from approximately March 31, 2003 through approximately April or May 2003, Plaintiff **DR. LARES'** actions were closely monitored by the Chief Resident, Dr. Ramona Stanculescu. For instance, Dr. Stanculescu monitored and recorded Plaintiff's arrival, departure, break and lunch times. In addition, Dr. Stanculescu repeatedly beeped Plaintiff awake during the times he was not working with a patient and trying to catch some rest. Moreover, Plaintiff **DR. LARES** was repeatedly reprimanded for wearing an earing, and his vacation requests were denied. The other residents were not similarly subjected to the same harsh scrutiny.

67. In approximately December 2002, Plaintiff **DR. LARES** discovered homophobic graffiti directed at him, written in black magic marker in a bathroom stall of the main Operating Room bathroom at **WESTCHESTER MEDICAL CENTER**. The graffiti read: "Here's where I took Jose's virginity."

68. In approximately January 2003, after realizing he was one month shy of eligibility for certification as a Neuroanesthesiologist, Plaintiff **DR. LARES** decided to make the best of an undesirable situation and asked Defendant **DR. McGOLDRICK** for an additional one month assignment to the neuroanesthesia rotation. Instead, Program Coordinator Dr. Bairamian

removed Plaintiff **DR. LARES** from the rotation, reassigning him to an additional month in ACT.

69.     From approximately January 26, 2003 through March 30, 2004, Plaintiff **DR. LARES** was absent due to an emergency hernia operation.  Approximately four weeks of that period, from approximately March 3, 2003 through March 30, 2003, was deemed short-term medical disability leave.  Plaintiff returned to work on or about March 31, 2003.

70.     In approximately late March 2003, Plaintiff **DR. LARES** informed Defendant **DR. McGOLDRICK** that his visa was scheduled to expire on June 30, 2003, the same day his employment and residency were scheduled to conclude.  Plaintiff explained that he had accrued unused vacation and holidays in excess of the leave he had been forced to take.  Plaintiff further explained that his residency program at Our Lady of Mercy actually started in June 1999, one month earlier than his original employment contract indicated.  Plaintiff **DR. LARES** therefore respectfully requested credit for time served and permission to graduate.  Plaintiff's request was denied.

71.     Instead, on or about March 2003, Defendant **KATHRYN McGOLDRICK, M.D.** offered to extend Plaintiff **DR. LARES'** contract six weeks so that he could complete his residency.

72.     On or about the first week of April 2003, Plaintiff **DR. LARES** met with Defendant **DR. McGOLDRICK** and accepted her proposal to extend his contract six weeks beyond June 30, 2003.

73.     In approximately May 2003, Plaintiff **DR. LARES** asked Chief Resident Dr. Stanculescu why he was being treated to such unfair and discriminatory treatment.  Dr. Stanculescu responded that she was following the orders of Academic Program Coordinator Dr.

Moses Bairamian and Defendant **DR. McGOLDRICK**

74.    In approximately April or May 2003, Plaintiff **DR. LARES** reported to the ER for the arrival of two critically injured patients.  In the ER, the helicopter crew inadvertently knocked over the intubation tray that **DR. LARES** had set up in preparation for emergency treatment.  The Attending Surgeon, Dr. Pastrana turned to **DR. LARES**, ripped his badge from his chest, and shouted at him to the effect: "You're an imbecile!  You'll never work in my ER room!  Tomorrow morning I'm going into **McGOLDRICK's** office and telling her what kind of scumbag she has working for her."  A few minutes later, **DR. LARES** was summoned back to the ER where he successfully performed the intubation.

75.    The following morning, on or about April or May 2003, Dr. Pastrana complained to Defendant **DR. McGOLDRICK** about Plaintiff **DR. LARES**.  Dr. Pastrana had made similar complaints on several prior occasions concerning other Residents, including Chief Resident Dr. Stanculescu.  On those occasions Defendant **DR. McGOLDRICK** routinely asked Dr. Pastrana to apologize.  However, Defendant **DR. McGOLDRICK** did not ask Dr. Pastrana to apologize to Plaintiff **DR. LARES**.  Moreover, **DR. LARES** was subsequently reprimanded by Defendant **DR. McGOLDRICK** concerning the incident.

76.    In approximately Spring 2003, Plaintiff **DR. LARES** accepted an anesthesiologist position with South Florida Anesthesia Associates, P.A.  The position, which was to start in September 2003, came with a starting annual compensation package of approximately $300,000.

77.    On or about May 7, 2003, Defendant **DR. McGOLDRICK** forwarded a written contract to Plaintiff **DR. LARES** extending his employment term approximately nine-and-a-half weeks, from July 1, 2003 through September 19, 2003.

78.    Defendant **WESTCHESTER MEDICAL CENTER**'s May 2003 employment offer to Plaintiff **DR. LARES** was based upon the positive recommendation of Defendant **DR. McGOLDRICK**.

79.    In approximately Spring 2003, Plaintiff **DR. LARES** received blood results indicating that he had an abnormally high white blood cell count and an enlarged lymph node. (and abnormal and dangerous levels of Hemoglobin)  Plaintiff's physician discussed several possibilities with him, including leukemia and HIV.  Plaintiff **DR. LARES** subsequently spoke in confidence to Defendant **WCHCC** employee Dr. Valerie Walker regarding the results and his physician's theories, and sought her professional advice.

80.    On or about May 14, 2003, Plaintiff **DR. LARES** and Defendant **WCHCC** entered into a written contract renewing Plaintiff's employment contract.

81.    As of June 30, 2003, Plaintiff **DR. LARES** had fulfilled all the requirements for completion of Defendant **WCHCC**'s residency program, and had fully complied with the standard requirements of the ECFMG, ACGME and FSB to obtain certification as an Anesthesiologist. (To be board elegible)

82.    On or about June 30, 2003, Plaintiff **DR. LARES**' visa expired.

83.    On or about July 1, 2003, Plaintiff **DR. LARES** met with **DR. McGOLDRICK** and informed her that his visa had expired but he anticipated the expeditious receipt of a work permit.

84.    On or about July 1, 2003, **DR. McGOLDRICK** instructed Plaintiff **DR. LARES** to resign, promising that he could return to work and complete his contract as soon as his visa issue was resolved.  At the time, numerous preferable options were available, including taking a leave of absence.

85.    On or about July 2, 2003, at Defendant **DR. McGOLDRICK**'s instruction, Plaintiff **DR. LARES** resigned.

86.    On or about September 26, 2003, Plaintiff **DR. LARES** obtained a new work permit.

87.    Commencing approximately late September 2003, Plaintiff **DR. LARES** e-mailed and telephoned Defendant **DR. McGOLDRICK**, informing her that he had his work permit and was ready to resume work.  Defendant **DR. McGOLDRICK** was non-responsive.

88.    Instead, since on or about September 26, 2003, Defendant **DR. McGOLDRICK** has refused to extend Plaintiff **DR. LARES'** contract.

89.    On or about December 2, 2003, Defendant **DR. McGOLDRICK** sent a bizarre e-mail to Plaintiff **DR. LARES**, suggesting that he "cease and desist" from contacting her further regarding her breach of contract or she would "initiate the appropriate action."

90.    In approximately December 2003, Program Coordinator Betty Van Vield informed Plaintiff **DR. LARES** that Defendant **DR. McGOLDRICK**  asked her to change Plaintiff's grade from "pass" to "fail."

91.    In approximately December 2003, Program Coordinator Betty Van Vield informed Plaintiff **DR. LARES** that Defendant **DR. McGOLDRICK** had told her: "I'd rather lose my position than sign his [Plaintiff's] degree."

92.    As a consequence of Defendants' conduct, Plaintiff **DR. LARES** has been unable to obtain certification concerning the completion of his residency and/or complete his residency. Moreover, as a consequence of Defendants' conduct, Plaintiff **DR. LARES** has been unable to accept the offer made by South Florida Anesthesia Associates, P.A. or obtain any other employment.  Plaintiff **DR. LARES'** employment with Defendant **WCHCC** ended just 26 days

short of the completion of his four-year residency.

93.     On or about March 2004, after Defendants ignored numerous requests by Plaintiff for a copy of the contents of his personnel file, Plaintiff **DR. LARES** went in person to request a copy of his personnel file.  Instead, Defendant **DR. McGOLDRICK** ordered security to escort Plaintiff **DR. LARES** from the building.  Upon their arrival, security threatened Plaintiff **DR. LARES** that they would summon Dr. Redstone to tranquilize him if he refused to leave.

94.     In approximately Summer 2004, the Committee of Interns & Residents determined that Defendant **WESTCHESTER MEDICAL CENTER** owed Plaintiff **DR. LARES** compensation for 35 days of accumulated holidays and vacation, totaling $7,821.82. However, Defendant **WESTCHESTER MEDICAL CENTER** has refused to pay.


## AS AND FOR A FIRST CAUSE OF ACTION
## ADA DISCRIMINATION

95.     Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

96.     During his employment at Defendant **WESTCHESTER MEDICAL CENTER**, Plaintiff **DR. LARES** was perceived as having a disability, namely, he was perceived as HIV-Positive.  HIV is a physical impairment which substantially limits major life activities, including the ability to procreate.

97.     In fact, Plaintiff **DR. LARES'** HIV status did not effect his ability to effectively perform his responsibilities as an Anesthesiology Resident for Defendant **WCHCC**.  Indeed, throughout his employment, Plaintiff's medical skills and work on behalf of **WESTCHESTER**

**MEDICAL CENTER** were deemed satisfactory.

98.     Instead of accepting the fact that Plaintiff **DR. LARES'** partner suffered from a

disability, namely, AIDS, Defendant WCHCC and **WESTCHESTER MEDICAL CENTER**,

through their directors, officers and supervisors, succumbed to ignorance, prejudice and hysteria

upon learning that Plaintiff **DR. LARES'** partner was HIV-Positive, and presumed that Plaintiff

was HIV-Positive as well.

99.     Commencing approximately March 2002, after Plaintiff disclosed his significant

other's HIV-Positive status to his supervisors, Plaintiff **DR. LARES** was treated differently than

employees at Defendant **WESTCHESTER MEDICAL CENTER** perceived as HIV-negative.

100.     This disparate treatment included different standards of conduct, unequal pay,

unequal work assignments, unequal benefits, unequal opportunities, unequal promotion, and

unequal disciplinary measures directed toward him as opposed to those employees similarly

employed by and situated at **WCHCC** who were thought to be HIV-negative.

101.     For instance, Defendant **WCHCC** waged a personal smear campaign against

Plaintiff **DR. LARES**, suddenly labeling Plaintiff as incompetent, emotionally volatile, and

threatening.

102.     Plaintiff **DR. LARES'** work product, which was consistently praised

prior to the disclosure of his partner's HIV status, was also suddenly subjected to unprecedented

scrutiny and criticism.

103.     Plaintiff's co-workers who were perceived to be non-disabled, HIV-negative

individuals were not subjected to similar scrutiny and disciplinary measures, which were created

by Defendant **WCHCC** as an artifice to legitimize its unlawful conduct.

104.     On numerous occasions, Plaintiff complained to Defendant **WCHCC** regarding

inappropriate conduct and comments, and discriminatory treatment, but nothing was done.

105.    On or about September 2003, Defendant **WCHCC** impermissibly terminated Plaintiff's employment because of Plaintiff **DR. LARES'** perceived disability and in direct retaliation for Plaintiff's pursuing his complaints of discrimination against Defendant.  In so doing, Defendant **WCHCC** effectively destroyed Plaintiff's medical career.

106.    The aforesaid discriminatory acts of Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, their officers, directors, supervisors, managers and/or employees, including Defendant **DR. McGOLDRICK,** perpetrated against Plaintiff **DR. LARES** because of his perceived disability, violated Plaintiff **DR. LARES'** rights as provided under The Americans' With Disabilities Act of 1990 ("ADA"), 42 U.S.C. Section 12101, et. seq.

107.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK,** Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

108.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK,** Plaintiff **DR. LARES** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by 42 U.S.C. Section 12101, et. seq., i.e., THREE HUNDRED THOUSAND ($300,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
### NYSHRL DISABILITY DISCRIMINATION

109.    Plaintiff **DR. LARES** repeats and realleges each and every allegation contained in

paragraphs 1 through 108 inclusive, with the same force and effect as though more fully set forth at length herein.

110.    The aforesaid acts by Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, their officers, directors, supervisors, managers and/or employees including Defendant **DR. McGOLDRICK,** perpetrated against Plaintiff **DR. LARES** because of his perceived disability, violated Plaintiff **DR. LARES'** rights as provided under The New York State Human Rights Law, Article 15 of the New York Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, <u>et. seq.</u>

111.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK,** Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

112.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK,** Plaintiff **DR. LARES** has been damaged and is entitled to compensatory damages as provided under 15 N.Y. Law Section 290 <u>et seq.</u> in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.


## AS AND FOR A THIRD CAUSE OF ACTION
## ADA - HARASSMENT/HOSTILE WORK ENVIRONMENT

113.    Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in paragraphs 1 through 112 inclusive, with the same force and effect as though more fully set forth at length herein.

114.    Commencing on or about March 2002 when Plaintiff **DR. LARES'** partner's HIV status became known at **WESTCHESTER MEDICAL CENTER** through his unlawful termination,

Defendant **WCHCC**, its officers, supervisors and employees, including Defendant **DR. McGOLDRICK**, created and maintained a hostile work environment through explicit and continued discrimination and harassment against **DR. LARES** because of his perceived HIV-Positive status.

115.    Instead of treating Plaintiff **DR. LARES** with common courtesy, compassion and respect, Defendant **WCHCC**, its officers, directors, supervisors and employees, subjected Plaintiff to ridicule and harassment when his co-workers and supervisors learned of his partner's HIV condition.

116.    Within **WCHCC** and **WESTCHESTER MEDICAL CENTER** there was a permissive and encouraging environment for discrimination and harassment among supervisors, managers and employees of the company against HIV-Positive employees.

117.    Defendant **WCHCC**'s discriminatory intimidation and harassment of Plaintiff **DR. LARES** was both severe and pervasive enough to alter the conditions of Plaintiff's employment.

118.    The aforesaid harassment and hostile work environment created by Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, their officers, directors, supervisors, managers and/or employees, including Defendant **DR. McGOLDRICK,** perpetrated against Plaintiff **DR. LARES** because of his perceived disability, violated Plaintiff **DR. LARES'** rights as provided under The Americans' With Disabilities Act of 1990 ("ADA"), 42 U.S.C. Section 12101, et. seq.

119.    As a consequence of the foregoing misconduct of Defendants **WCHCC,** **WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**, Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

120.    As a consequence of the foregoing misconduct of Defendants **WCHCC,**

WESTCHESTER MEDICAL CENTER and DR. McGOLDRICK, Plaintiff DR. LARES has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by 42 U.S.C. Section 12101, et. seq., i.e., THREE HUNDRED THOUSAND ($300,000.00) DOLLARS.

## AS AND FOR A FOURTH CAUSE OF ACTION
## NYSHRL - DISABILITY HARASSMENT/HOSTILE WORK ENVIRONMENT

121.    Plaintiff DR. LARES repeats and realleges each and every allegation contained in paragraphs 1 through 120 inclusive, with the same force and effect as though more fully set forth at length herein.

122.    The aforesaid harassment and hostile work environment created by Defendants WCHCC and WESTCHESTER MEDICAL CENTER, its officers, directors, supervisors, managers and/or employees including Defendant DR. McGOLDRICK, perpetrated against Plaintiff DR. LARES because of his perceived disability, violated Plaintiff RICHARD KELLY's rights as provided under The New York State Human Rights Law, Article 15 of the New York Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, et. seq.

123.    As a consequence of the foregoing misconduct of Defendants WCHCC, WESTCHESTER MEDICAL CENTER and DR. McGOLDRICK, Plaintiff DR. LARES sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

124.    As a consequence of the foregoing misconduct of Defendants WCHCC, WESTCHESTER MEDICAL CENTER and DR. McGOLDRICK, Plaintiff DR. LARES has been damaged and is entitled to compensatory damages as provided under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NYCHRL - SEXUAL ORIENTATION DISCRIMINATION

125.    Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

126.    The aforesaid discriminatory acts by Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, its officers, directors, supervisors, managers and/or employees including Defendant **DR. McGOLDRICK**, perpetrated against Plaintiff **DR. LARES** because of his sexual orientation, violated Plaintiff **DR. LARES'** rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

127.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**, Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

128.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**,  Plaintiff **DR. LARES** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NYCHRL - SEXUAL ORIENTATION HARASSMENT/
## HOSTILE WORK ENVIRONMENT

129.    Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

130.    The aforesaid harassment and hostile work environment created by Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, its officers, directors, supervisors, managers and/or employees including Defendant **DR. McGOLDRICK**, because of Plaintiff's sexual orientation, violated Plaintiff **DR. LARES'** rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

131.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**, Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

132.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**,  Plaintiff **DR. LARES** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NYSHRL - SEXUAL ORIENTATION DISCRIMINATION

133.    Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in

paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

134.    The aforesaid discriminatory acts by Defendants **WCHCC** and **WESTCHESTER MEDICAL CENTER**, its officers, directors, supervisors, managers and/or employees including Defendant **DR. McGOLDRICK**, perpetrated against Plaintiff **DR. LARES** because of his sexual orientation, violated Plaintiff **DR. LARES'** rights as provided under The New York State Human Rights Law, Article 15 of the New York Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, <u>et. seq.</u>

135.    As a consequence of the foregoing misconduct of Defendants **WCHCC,** **WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**, Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

136.    As a consequence of the foregoing misconduct of Defendants **WCHCC,** **WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**,  Plaintiff **DR. LARES** has been damaged and is entitled to compensatory damages as provided under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION
NYSHRL - SEXUAL ORIENTATION HARASSMENT/
HOSTILE WORK ENVIRONMENT</u>

137.    Plaintiff **DR. LARES**  repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

138.    The aforesaid harassment and hostile work environment created by Defendants

WCHCC and **WESTCHESTER MEDICAL CENTER**, its officers, directors, supervisors, managers and/or employees including Defendant **DR. McGOLDRICK**, perpetrated because of Plaintiff's sexual orientation, violated Plaintiff **DR. LARES'** rights as provided under The New York State Human Rights Law, Article 15 of the New York Executive Law ("NYSHRL"), 15 N.Y. Exec. Law Section 290, <u>et.</u> <u>seq.</u>

139.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**, Plaintiff **DR. LARES** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

140.    As a consequence of the foregoing misconduct of Defendants **WCHCC, WESTCHESTER MEDICAL CENTER** and **DR. McGOLDRICK**,  Plaintiff **DR. LARES** has been damaged and is entitled to damages in the sum prescribed under 15 N.Y. Exec. Law Section 297(4)(c) in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS..


<u>AS AND FOR A NINTH CAUSE OF ACTION</u>
<u>BREACH OF CONTRACT</u>

141.    Plaintiff **DR. LARES** repeats and realleges each and every allegation contained in paragraphs 1 through 94 inclusive, with the same force and effect as though more fully set forth at length herein.

142.    That on or about May 14, 2003, Plaintiff **DR. LARES** entered into an employment contract with Defendant **WCHCC**, the terms of which included his position as a Resident Physician in Defendant **WESTCHESTER MEDICAL CENTER**'s Anesthesiology Department, a salary in the amount of $58,328.00, and an employment term of July 1, 2003 to

September 19 2003.

143.    On or about July 2, 2003, Defendant **DR. McGOLDRICK** caused Plaintiff **DR. LARES** to resign his position at Defendant **WESTCHESTER MEDICAL CENTER** until his visa was re-issued.  In so doing, Defendant **DR. McGOLDRICK** promised Plaintiff **DR. LARES** that he would be permitted to return to his employment, and complete the final semester of his residency, immediately upon proof of a valid work permit.  Plaintiff also explained to Defendant **DR. McGOLDRICK** that he was allowed one month's grace period to continue working. However, Defendant **DR. McGOLDRICK** refused to permit his continued employment.

████    On or about September 26, 2003, Plaintiff **DR. LARES** received a new work permit.

145.    On or about late September 2003, Plaintiff **DR. LARES** presented proof of his valid work permit and requested that Defendants honor their agreement.  Defendants refused.

146.    In accepting employment at **WCHCC**, and in choosing to come forward with his partner's HIV-Positive status, Plaintiff **DR. LARES** relied upon the verbal representations made to him by **WCHCC's** executives, directors, officers and/or supervisors, as well as the written representations contained in his company's employee handbooks and discrimination policies, which purported to prohibit discrimination and retaliation against employees who are disabled and/or perceived to be disabled.

147.    In accepting employment at **WCHCC**, and in choosing to disclose his sexual orientation, Plaintiff **DR. LARES** relied upon the verbal representations made to him by **WCHCC's** executives, directors, officers and/or supervisors, and the written representations contained in his company's employee handbooks and discrimination policies, which purported to prohibit discrimination and retaliation against employees because of their sexual orientation.

148.    As set forth hereinabove, Defendant **WCHCC** breached this employment contract.

149.    Moreover, as set forth hereinabove, Defendant **WCHCC** breached its initial employment contract with Plaintiff **DR. LARES** by refusing to pay the accrued vacation pay and sick pay presently owed.

150.    As a consequence of the foregoing misconduct of Defendant **WCHCC,** Plaintiff **DR. LARES** has sustained compensatory and economic damages in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.  Furthermore, Plaintiff **DR. LARES** is entitled to reinstatement of his residency or credit for time served so that he is certified as having completed his residency.

## AS AND FOR PLAINTIFF'S TENTH CAUSE OF ACTION
## WHISTLE-BLOWER

151.    Plaintiff repeats and realleges each of the allegations and assertions contained in paragraphs 1 through 16, and 42-94 above as if more fully set forth herein.

152.    In approximately March 2002, Plaintiff **DR. LARES** alerted Defendant **DR. McGOLDRICK** concerning medical malpractice perpetrated by a Resident Physician and Attending Physicians at Defendant **WESTCHESTER MEDICAL CENTER** that culminated in the untimely death of a patient.

153.    On or about March 2002, Plaintiff **DR. LARES** further alerted Defendant **DR. McGOLDRICK** that the patient's chart revealed that the patient had been administered lethal dosages of medicines which appeared to have caused the patient's untimely death.

154.    On or about March 2002, Defendant **DR. McGOLDRICK** forbade Plaintiff **DR.**

LARES to present his findings at the hospital's Morbidity Mortality Conference, and threatened Plaintiff's continued employment.

155.    In approximately October 2002, Plaintiff **DR. LARES** alerted Defendant **DR. McGOLDRICK** concerning medical malpractice perpetrated by a nurse and exacerbated by inadequate staffing and emergency equipment at Defendant **WESTCHESTER MEDICAL CENTER** that caused the untimely death of a second patient at the hospital on October 7, 2002.

156.    On numerous occasions prior to October 7, 2002, Plaintiff **DR. LARES** had complained to Defendant **DR. McGOLDRICK** that Defendant **WESTCHESTER MEDICAL CENTER** had dangerously inadequate supplies of emergency equipment.

157.    On or about October 2002, Plaintiff **DR. LARES** further alerted Defendant **DR. McGOLDRICK** that the patient's chart failed to disclose the full circumstances underlying the patient's untimely death.

158.    On or about October 27, 2002, Defendant **DR. McGOLDRICK** abruptly ordered Plaintiff **DR. LARES** to stop speaking as he attempted to disclose the circumstances underlying the patient's death at the Morbidity Mortality Conference.

159.    In so doing, Plaintiff **DR. LARES** disclosed conduct at Defendant **WESTCHESTER MEDICAL CENTER** that presented a danger to the public's health and safety.

160.    As the consequence of Plaintiff's whistle-blowing, Plaintiff **DR. LARES** was retaliated against by Defendant **DR. LARES**, Defendant **WESTCHESTER MEDICAL CENTER** and Defendant **WCHCC.**  In an attempt to cover up their own wrongdoing, Defendants discredited Plaintiff and subjected him to continuous harassment.  Defendants' retaliation culminated in the premature termination of Plaintiff's residency and employment, and essentially destroyed Plaintiff's medical career.

161.    Defendant **WCHCC**'s conduct in refusing to renew Plaintiff's employment contract with Defendant constitutes a violation of New York State Labor Law § 740.

162.    As a consequence of the foregoing misconduct of Defendant **WCHCC,** Plaintiff **DR. LARES** has sustained compensatory and economic damages in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.   Furthermore, Plaintiff **DR. LARES** is entitled to reinstatement of his residency or credit for time served so that he is certified as having completed his residency.

**WHEREFORE,** Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK** in the First Cause of Action in the amount of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS; Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK** in the Second Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS;  Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK** in the Third Cause of Action in the amount of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS; Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK**  in the Fourth Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK** in the Fifth Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL**

COLLEGE and **DR. KATHRYN McGOLDRICK** in the Sixth Cause of Action in the amount of

FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **DR. LARES** demands judgment against

Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN**

**McGOLDRICK** in the Seventh Cause of Action in the amount of TWENTY-FIVE MILLION

($25,000,000.00) DOLLARS;  Plaintiff **DR. LARES** demands judgment against Defendants

**WCHCC, WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK** in

the Eighth Cause of Action in the amount of  TWENTY-FIVE MILLION ($25,000,000.00)

DOLLARS; Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC,**

**WESTCHESTER MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK**  in the Ninth

Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS;

Plaintiff **DR. LARES** demands judgment against Defendants **WCHCC, WESTCHESTER**

**MEDICAL COLLEGE** and **DR. KATHRYN McGOLDRICK**  in the Ninth Cause of Action in

the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; and Plaintiff **DR. LARES**

demands judgment against Defendants **WCHCC, WESTCHESTER MEDICAL COLLEGE** and

**DR. KATHRYN McGOLDRICK** in the Tenth Cause of Action in the amount of TWENTY-FIVE

MILLION ($25,000,000.00) DOLLARS, plus punitive damages, all together with the costs and

disbursements of this action, including attorneys' fees, plus interest, and for any other relief which

//

//

//

//

//

//

this Court deems just and proper.


Dated:        New York, New York
              January 24, 2005

                        Yours, etc.,

                        BENEDICT P. MORELLI & ASSOCIATES


              By:

                        David S. Ratner, Esq. (DSR-7758)
                        Martha M. McBrayer, Esq. (MM-7097)
                        950 Third Avenue, 11th Floor
                        New York, New York 10022
                        (212) 751-9800